ÁNGEL LUIS RÍOS PÉREZ ET AL., Plaintiffs and Appellees, *v.* PUERTO RICO WATER RESOURCES AUTHORITY, Defendant and Appellant.

No. R-62-245.     Decided June 14, 1966.

*José Antonio Arabía* for appellant. *B. Quiñones Elías, S. Quiñones Elías, Luis A. Garrastegui,* and *Tomás Torres Cortés* for appellees.

Second Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

From among the findings of the trial court we pick out the following as most significant: That the Puerto Rico Water Resources Authority made the studies, design, and construction of the Yahuecas dam in Adjuntas, Puerto Rico, having terminated the same in October 1956; that the Water Resources Authority owns, supervises, controls, and operates the said Yahuecas dam; that the Yahuecas dam is a diversion dam, gravity type, designed and constructed with a concrete wall 75 feet high from its deepest point; that the Water Resources Authority installed on the spillway of the dam some flashboards as follows: 8 sections 26 feet 6 inches long, of which 4 sections 4 feet high are in the center, 2 sections 5 feet high are on the left, and 2 sections 6 feet high on the right; that the sections referred to in the preceding finding are separated by concrete piers. The flashboards consist of planks 23 feet 6 inches long by 1 foot wide by 2 inches thick placed horizontally. These planks are attached horizontally to galvanized pipes 4 inches in diameter, which in turn are placed in holes 4 inches in diameter by 32 inches deep in the spillway and fastened with lead. These pipes were placed 3 feet 4 inches apart. The flashboards are attached to

iron pipes; a wooden piece or plank 2 inches thick is placed on the pipe and held together with three U-shaped clamps. A wooden piece is placed in between the pipes and nailed to the planks. The planks are placed upstream. A turnbuckle is used on an iron plate which is placed on the last plank. This turnbuckle is anchored to a thick rod left upstream on the spillway. Fifty-six turnbuckles were used in Yahuecas dam. That the flashboards were designed or used by the Water Resources Authority for the conservation of water; that as a result of the Greta storm which passed about 200 miles north of Puerto Rico, heavy rains fell on November 4, 1956 in the Yahuecas dam area; that on the evening of November 4, 1956, the hydrodynamic pressure detached the flashboards causing a sudden flood which swept over and caused the death by asphyxia by submersion of Luis Ríos González and his wife, Otilia Pérez Pérez, who were in the vicinity of a place known as El Paso de Calcerrada, used by the neighbors to cross from one side of the river to the other; that ever since the Río Blanco waters were contained by the construction of the Yahuecas dam no floods were produced downstream from the dam on Río Blanco such as that which occurred on the evening of November 4–5, 1956, nor have any sudden floods been produced subsequent thereto; that subsequent to November 4, 1956, and in view of its experience of that day, the Water Resources Authority redesigned and changed the turnbuckles of the flashboards in order that they could resist a higher altitude of the water; that on November 4, 1956, and prior thereto the Water Resources Authority did not take precautions by giving notice or warning of the danger in the event the flashboards should be destroyed. Nor did it take any action to remove or cause the flashboards to resist so as to cause a sudden overflow. Likewise, it did not have an employee, agent, person in charge, or watchman to open the gates so that the waters would flow gradually; that the Water Resources Authority,

in constructing and maintaining a flashboard which evidently would be subject to the impact of the hydrodynamic pressure, which flashboards by themselves, because they are constructed of material which is less resistant than concrete, are dangerous and insecure, could have averted by exercising ordinary prudence, the death of Luis Ríos González and Otilia Pérez Pérez; that the weight of authorities· on matter of hydraulic engineering label this type of flashboards as unrecommendable because they are not reliable, since they may break loose and run downstream because the resistance calculations do not produce at times the expected result . . . (and) the wear and corrosion factors produce the failure of these additives, contrarily to what was expected in the designs . . . (and thus) are infrequently used, except as temporary implements to provide capacity to the lake, but their action is insecure. . . .

The evidence presents a terse and rather abstract scientific theory of the impossibility of a sudden flood which could produce death by asphyxia by submersion, presented by defendant-appellant and the dramatic picture, intensely close to the reality of the facts presented by the evidence of plaintiffs-appellees. Let us examine the account of witness Joaquín Ramos, the most alert eye in the face of adversity:

"Q. Do those four cuerdas of yours adjoin any property of the Water Resources Authority?
A. Yes, sir.
Q. What property?
A. The Yahuecas dam, but which is Guayabo Dulce.
Q. Does the Authority pay you anything for your property?
A. Yes, sir; they gave me $75 for the condemnation.
Q. Does the water from the dam run through your lands?
A. Yes.
Q. Tell me something, do you live nearby?
A. Close above the dam.
Q. What distance is there, more or less, approximately from your house to that wall?

A. More or less 100 or 150 meters.

Q. Can you see the wall from your house?

A. Yes.

Q. Do you recall, did you ever work for the Authority in that dam?

A. Yes.

Q. What work did you do?

A. At first as a watchman and then as a laborer.

Q. When they were constructing that?

A. Yes.

Q. Do you recall if after they constructed it . . . do you know whether anything occurred in that dam on the evening of November 4–5, 1956?

A. Well, on the 4th it rained all day; in the evening we went to bed between eleven and twelve o'clock. We heard the volcano . . .

Q. Of what?

A. Of the . . . something like an explosion which occurred in the dam. Then . . .

Q. And what happened?

A. We got up.

Q. Who is we?

A. Myself, my older son, and a younger one.

Q. You got up?

A. Then, we stood next to the house and saw like a cloud of smoke arising from the water; as the explosion of the water fell down below, a smoky mist arose.

Q. As the water fell? Were you in bed?

A. Then we stood next to the house and saw the "smoke" from the water as it fell, the explosion of the water down below, you could see the smoke".

Q. As the water fell?

A. Yes.

Q. Were you in bed asleep?

A. Yes.

Q. The noise, how was it?

A. As when a drill explodes down below, we heard the explosion.

Q. As if it exploded? Next day, did you notice anything?

A. We noticed that it had washed away the planks.

Q. It had carried away all of them?

A. Yes, sir, all of them.

Q. Tell me something. Do you recall whether later they put some boards there, planks of that kind?

A. Yes, they came and enlarged the whole place quite a bit.

Q. Afterwards?

A. Yes.

Q. Was there any difference between the position of the planks before the river washed them away and those which were there afterwards, if you recall, if you noticed?

A. There was a distance of more or less six feet; the cables extended from one to the other.

Q. When?

A. Before.

Q. And afterwards?

A. Now they are closer.

Q. Tell me something. Do you know whether the Water Resources Authority had a man there to warn the people down there, in the ward?

A. There was none.

Q. That's all, Y.H., that's all."

■■ We have studied the evidence calmly and weighed the analytical study of the attorneys for both parties, and we are satisfied that the findings of the trial court reflect the most rational and fair balance of the evidence in the present case. In what we cannot agree with the trial court is in the amount of compensation awarded to plaintiffs. The only reason for compensating them is because, "with the exception of Josefa Ramona Ríos Pérez, all their other children and plaintiffs in this case depended entirely on them for their subsistence." We presume that plaintiff Josefa Ramona Ríos Pérez is compensated for *pecunia doloris*.

Taking as starting point the date of the accident and considering the picture of dependency by reason of family nexus, or the measure of that imponderable loss of company and moral suffering produced by the death of a relative, we shall award the following compensations: to Josefa Ramona

Ríos Pérez, $7,500; to Ángel Luis Ríos Pérez, $8,000; to María Eroilda Ríos Pérez, $9,000; to José Ramón Ríos Pérez, $10,000; to Olga Iris Ríos Pérez, $11,000; to Luz Nilda Ríos Pérez, $11,000; to Wilfredo Ríos Pérez, $11,000; to Héctor Luis Ríos Pérez, $12,000. We also consider that the sum of $20,000 for attorney's fees is excessive and shall reduce it to $7,000.

As thus modified, the judgment will be affirmed.